UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------- X
                                    :

BRIAN DUNLEAVY
EILEEN SHULOCK                         :   **THIRD AMENDED COMPLAINT**

             Plaintiffs,           :   14-CV-1833(VSB)(GWG)

             -against-         :   JURY TRIAL DEMANDED

THE CITY OF NEW YORK, POLICE OFFICER
ERIC DUVAL, (shield no. 8109); POLICE OFFICER
CHRISTOPHER NUNZIATO, (shield no. 9883)
POLICE OFFICER JOHN DOE NO. 1 (*the name
"John Doe" being fictitious, the real name being
presently unknown*

             Defendants.
-------------------------------------------------------------------------- X

Plaintiffs BRIAN DUNLEAVY and EILEEN SHULOCK, by and through their attorneys, **THE LAW OFFICES OF KENNETH F. SMITH, PLLC**, complaining of the defendants herein, respectfully show the Court and allege:

## PRELIMINARY STATEMENT

1.    This is a civil rights action in which the plaintiffs seek relief for the defendants' violation of their rights secured by the Civil Rights Act of 1871, 42 U.S.C. §§ 1981 and 1983; by the United States Constitution, including its Fourth and Fourteenth Amendments, and by the laws and Constitution of the State of New York.

2.    The claims arise from a June 29, 2013 incident in which officers of the New York City Police Department ("NYPD"), acting under color of state law, intentionally and willfully subjected plaintiffs to, *inter alia*, false arrest, false imprisonment, fabrication of evidence, malicious prosecution, excessive use of force and assault.

3.      The plaintiffs seek monetary damages (special, compensatory and punitive) against defendants, as well as an award of attorney's fees and such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

4.      Jurisdiction of this Court is invoked under 28 U.S.C. § 1343 and 42 U.S.C. §§ 1981 and 1983.

5.      The plaintiffs further invoke this court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and as against all parties that are so related to claims in this action within the original jurisdiction of this court that they form part of the same case or controversy.

6.      Venue herein is proper for the United States District Court for the Southern District of New York under 28 U.S.C. §1391 (a), (b) and (c), in that the events giving rise to the claim occurred within the boundaries of the Southern District of New York.

## JURY DEMAND

7.      Plaintiffs demand a trial by jury in this action.

## PARTIES

8.      Plaintiff BRIAN DUNLEAVY is a fifty-three year old male who at all times hereinafter mentioned was and is a resident of the State of New York and the County of New York.  He is the husband of co-plaintiff Shulock.

9.      Plaintiff EILEEN SHULOCK is a fifty year old female who at all times hereinafter mentioned was and is a resident of the State of New York and the County of New York. She is the wife of co-plaintiff Dunleavy.

2

10.     Defendants DUVAL and NUNZIATO and JOHN DOE NO.1 are and were at all times relevant herein duly appointed and acting officers, servants, employees and agents of defendant the City of New York and/or the New York City Police Department, a municipal agency of defendant the City of New York.  Defendants Duval and Nunziato are and were at all times relevant herein acting under color of state law in the course and scope of their duties and functions as officers, agents, servants, and employees of defendant the City of New York, were acting for, and on behalf of, and with the power and authority vested in them by defendant the City of New York and the New York City Police Department, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.  Defendants Duval and Nunziato (and John Doe no. 1) are sued individually.

11.     Defendant City of New York ("the City") is a municipality organized and existing under the laws of the State of New York. At all times relevant hereto, the City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, and conduct of all NYPD personnel. In addition, at all relevant times, the City was responsible for enforcing the rules of the NYPD (and regulations of the NYPD patrol guide), and for ensuring that the NYPD personnel obey the laws of the United States and of the State of New York.

## STATEMENT OF FACTS

12.     On June 29, 2013, approximately 6:45PM, plaintiffs were inside of Washington Square Park South, New York County, walking their dog in the area designated for off-leash canine recreation (the "dog run") that is adjacent to Sullivan Street.

13.     At that time an apparent traffic jam occurred on Sullivan Street in the area just outside the dog run.  Traffic was stopped and several cars, including what appeared to be New York City Taxicabs, were sounding their horns.

14.     Plaintiffs, who were at that time seated inside the park, on a bench inside the dog run, (which was itself separated from the street by at least two layers of fencing), were having a private conversation with several other individuals who were also sitting or standing in the dog run.

15.     Plaintiff Dunleavy commented on the futility of the aggressive horn honking by the cars which were locked in traffic.  His comments were directed at his wife and several others in the vicinity.

16.     At that time plaintiff Dunleavy was startled to hear a voice ask loudly and aggressively "who said that?", and turned to see an apparent New York City taxicab (bearing number "2W68") stopped, with two uniformed police officers (defendant police officers) emerging from the front seat driver and passenger side doors.

17.     Defendant Nunziato stated in sum that (1) he and his partner were in "an emergency", and did not appreciate being "forced" to stop and "deal with this", (2) that if the person who had made the comment did not reveal himself, that defendants would enter the dog run and issue summonses to everybody within.

4

18.     Plaintiff Dunleavy then stood up and told defendant Nunziato that it was he that had made the comment about the horn honking being futile, whereupon defendant Nunziato ordered plaintiff Dunleavy to exit the dog run and come to the street where defendant Nunziato was standing.

19.     Plaintiff Dunleavy asked several times why he was being ordered to exit the park and go to the officers to which defendant Nunziato stated only "are you going to come out here or are we going to have to come in there and get you?"   Plaintiff Dunleavy stated he would comply and exited the dog run.

20.     When Dunleavy exited the park and approached defendant police officers on the street where they stood waiting for him, he was immediately grabbed by both and handcuffed tightly.   Plaintiff did not resist in any way.

21.     When defendant police officers handcuffed plaintiff Dunleavy more than a few bystanders expressed incredulity at the unfolding events, as did Dunleavy's wife, plaintiff Eileen Shulock.

22.     As people began to stop and watch in surprise, several bystanders as well as plaintiff Shulock, approached the defendant police officers and were shouted at or roughly shoved away by defendant police officers.

23.     After detaining plaintiff Dunleavy for several minutes in a standing position by the side of the Taxi/Police car, as defendant police officers pushed Dunleavy into the rear of the car, plaintiff Shulock approached defendant police officers whereupon defendant Duval immediately grabbed plaintiff Shulock.

24.     Defendant Duval squished and pinned plaintiff Shulock (who was wearing a support brace on her knee at the time due to a knee condition) against the car and repeatedly twisted her arms behind her back before handcuffing her tightly.

25.     Defendant police officers placed plaintiff Shulock in the car and both plaintiffs were brought to the Sixth Precinct for "processing".   At some point, one of the defendant officers, (both of whom were by then on notice that plaintiff Dunleavy suffers from a condition that causes muscle weakness, aggressively pushed or twisted Dunleavy's leg, causing him much knee pain.

26.     Plaintiff Dunleavy was issued a summons (no. 4411797064) charging him with the Violation of Disorderly Conduct, (NY Penal Law §240.20(3)), and ordering him to appear in court on September 17, 2013.

27.     Plaintiff Shulock was arraigned in New York County Criminal Court on a Misdemeanor Information sworn out by defendant Duval charging her with the Class "A" Misdemeanor crimes of Obstructing Governmental Administration in the Second Degree (NYPL §195.05); and Resisting Arrest (NYPL §205.30); as well as the Violation of Harassment in the Second Degree, under docket number 2013NY050300.

28.     On plaintiff Dunleavy's Summons return date of September 17, 2013, when he reported as directed to the Office of the Clerk at the Summons Return Part at 346 Broadway, New York, plaintiff Dunleavy was handed a form letter stating in sum that the NYPD had "failed to file a valid accusatory instrument in the time allotted" and that the case was a nullity.

6

29.     Plaintiff Shulock appeared in New York Criminal Court on three successive dates following her arraignment before the District Attorney's office moved to dismiss all charges against her[1].

30.     Defendant Nunziato has been previously sued in this court for false arrest and related charges.

31.     In *Quincy Jones & Jamal Peoples v. The City of New York et.al*, (13-CV-5222) defendant Nunziato is alleged to have falsely arrested plaintiffs in allegations that are similar to the instant case.

32.     In that case, plaintiffs (both African American, one of whom is an eighty-one year old luminary of jazz music who has won some twenty-seven Grammy awards) were arrested by defendant Nunziato for "being in my neighborhood after I told you not to come back here", notwithstanding the fact the plaintiffs were leaving a jazz club where they had concluded a performance.    Criminal charges against both men were dismissed after repeated court appearances.

33.     In each of the above lawsuits against defendant Nunziato, Nunziato was provided legal representation by Defendant City of New York.

34.     In each of the above lawsuits against defendant Nunziato, defendant City of New York paid money to the plaintiffs in said lawsuits in order to reach a settlement agreement with said plaintiffs.

35.     Defendant Duval has also been sued in this Court for false arrest, excessive use of force, and other related charges.

---

[1] Following a discovery conference between defense counsel and the district attorney that included a viewing of video evidence in this case, taken by bystanders, the district attorney unilaterally had the case advanced and dismissed.

36.     In *Michael Gjenvick v. The City of New York, et.al.*, (13-CIV-6376), defendant Duval was alleged to have used wildly excessive force in falsely arresting the plaintiff on charges that were dismissed, leaving plaintiff with severe and lasting injuries.

37.     In each of the above lawsuits against defendant Duval, Duval was provided legal representation by Defendant City of New York.

38.     In each of the above lawsuits against defendant Duval, defendant City of New York paid money to the plaintiffs in said lawsuits in order to reach a settlement agreement with said plaintiffs.

39.     Since the legal counsel for defendant City of New York has already represented defendants Duval and Nunziato in multiple lawsuits alleging unconstitutional conduct by defendants Nunziato and Duval, defendant City of New York is on notice regarding the propensity for defendants Nunziato and Duval to act in a manner which violates the rights of citizens with whom they come in contact.

40.     Yet, upon information and belief, defendant City of New York has neither required that defendants Nunziato and Duval obtain remedial training, nor has provided any remedial training in the areas of, *inter alia* probable cause requirement to make an arrest, and the appropriate use of force in making an arrest.

41.     Nor has defendant City disciplined or otherwise checked the conduct of defendants Duval and Nunziato, but rather, has rewarded them by providing a specialized NYPD vehicle for their use[2].

---

[2] http://gawker.com/this-is-the-nypds-secret-spy-cab-1203862686, *also see*:
https://www.youtube.com/watch?v=JNNdCe2f3fE

42.     At all times during the events described, the defendant police officers were engaged in a joint venture.  The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events.  They failed to intervene in the obviously illegal actions of their fellow officers against plaintiffs.

43.     During all of the events described, defendant police officers acted maliciously and with intent to injure plaintiffs.

44.     As a direct and proximate result of the acts of defendants, plaintiffs suffered the following injuries and damages:

   a)  Violation of plaintiffs' right, pursuant to the Fourth Amendment of the United States Constitution, to be free from unreasonable search and seizure;

   b)  Violation of plaintiffs' New York State constitutional rights under Article 1, §12, to be free from an unreasonable search and seizure;

   c)  Violation of plaintiffs' right to Free Speech, pursuant to Article 1 §8 of the New York State constitution and the First Amendment to the United States Constitution;

   d)  Violation of plaintiffs' right to Due Process of Law pursuant to Article 1, §6 of the New York State constitution and the Fourteenth Amendment to the United States Constitution;

   e)  Violation of plaintiffs' right to be free from Cruel and Unusual Punishment pursuant to the Eighth Amendment of the United States Constitution;

   f)  Violation of plaintiff's right to fair legal process pursuant to the Sixth Amendment of the United States Constitution;

g) Pain, suffering and physical injury;

h) Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience and anxiety;

i) Loss of liberty.

### FIRST CAUSE OF ACTION
### Deprivation of Federal Civil Rights under the United States Constitution and 42 U.S.C. §§ 1981 and 1983

45. The preceding paragraphs are here incorporated by reference.

46. By their conduct and actions in unlawfully detaining, searching, arresting, imprisoning plaintiffs, and in fabricating evidence against plaintiffs, and in failing to intercede on behalf of plaintiffs and protect them from the unjustified and unconstitutional treatment they received at the hands of other defendant, defendants Duval and Nunziato, acting with animus, and under color of law and without lawful justification, intentionally, maliciously, and with deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, caused injury and damage in violation of the plaintiffs' constitutional rights as guaranteed under 42 U.S.C. §§ 1981 and 1983 and the United States Constitution, including its First, Fourth and Fourteenth Amendments.

47. As a result of the foregoing, plaintiffs were deprived of their liberty, suffered emotional distress, great anxiety and humiliation, pain, physical injury, fear and damage to their reputations, and were otherwise damaged and injured.

## SECOND CAUSE OF ACTION
### Liability for New York State Constitutional Violations
### under Article I §§ 1, 5, 6, 8, 11 & 12

48.     The preceding paragraphs are here incorporated by reference.

49.     By reason of the foregoing, and by arresting, detaining and imprisoning plaintiffs without probable cause or reasonable suspicion, and harassing and assaulting them and depriving them of due process and equal protection of laws, defendant police officers deprived plaintiffs of rights, remedies, privileges and immunities guaranteed to every New Yorker by Article I §5 (prohibiting cruel and unusual punishments), Article I §6 (providing for due process), Article I §8 (guaranteeing freedom of speech), Article I §11 (prohibiting discrimination in civil rights and providing for equal protection of laws) and Article I §12 (prohibiting unreasonable searches and seizures) of the New York State Constitution.

50.     In addition, defendant police officers conspired among themselves and conspired with other individuals to deprive plaintiffs of their rights secured under Article I §§ 5, 6, 8, 11 and 12 of the New York State Constitution and took numerous overt steps in furtherance of such conspiracy, as set forth above.

51.     Defendant officers acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employments as officers, agents or employees.  Defendant officers' acts were beyond the scope of their jurisdiction, without any authority of law, and were in abuse of their powers. Defendant officers acted willfully, knowingly, and with the specific intent to deprive plaintiffs of their rights as secured by Article I §§ 5, 6, 8, 11 and 12 of the New York State Constitution.

52.   Defendant police officers, their officers, agents, servants and employees were responsible for the deprivation of plaintiffs' state constitutional rights.

## THIRD CAUSE OF ACTION
### False Arrest and Unlawful Imprisonment

53.   The preceding paragraphs are here incorporated by reference.

54.   Defendant police officers subjected plaintiffs to false arrest, false imprisonment and deprivation of liberty without probable cause.

55.   Defendant police officers have deprived plaintiffs of their civil, constitutional and statutory rights and have conspired to deprive them of such rights and are liable to plaintiffs under 42 U.S.C. §§ 1983 and 1985 and the New York State Constitution.

56.   As a result of the false arrest, imprisonment, and deprivation of liberty, plaintiffs were injured.

## FOURTH CAUSE OF ACTION
### Deprivation of Federal Civil Rights under 42 U.S.C. § 1985

57.   The preceding paragraphs are here incorporated by reference.

58.   In an effort to find fault to use against the plaintiffs, defendant officers conspired among themselves, and conspired with others to deprive plaintiffs of their Constitutional rights under 42 U.S.C. §1983, and the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and took numerous overt steps in furtherance of such conspiracy, as set forth above.

59.   Thus defendant officers engaged in a conspiracy designed to deprive plaintiffs of their constitutional and federal rights in violation of U.S.C. §1985.

60. As a direct and proximate result of the abuse of authority detailed above, plaintiffs sustained the damages stated.

## FIFTH CAUSE OF ACTION
### Falsification of Evidence under 42 U.S.C. § 1983

61. The preceding paragraphs are here incorporated by reference.

62. The defendant police officers are liable to plaintiffs because they intentionally conspired to fabricate evidence against plaintiffs, depriving plaintiffs of liberty without due process of law.

63. Furthermore, the defendant police officers violated the law by making false statements by drafting and/or signing sworn criminal court complaints and false police reports.

64. Furthermore, the individual defendant police officers violated the law by manipulating evidence to attempt to obtain a prosecution and unjust conviction, while performing the function of investigators.

65. The individual defendant police officers were on notice that creating fabricated evidence is a clear violation of law because it well established that individuals who knowingly use false evidence at trial to obtain a conviction act unconstitutionally and that this is redressable in an action for damages under 42 U.S.C. § 1983.

66. The individual defendant police officers are also liable to plaintiffs because they intentionally created false information likely to influence a fact finder's or jury's decision by, inter alia, forwarding false information to prosecutors, drafting and signing sworn criminal court complaints and police reports, omitting and/or manipulating evidence, fabricating testimony and evidence, suppressing and concealing exculpatory material

13

and evidence, and forwarding and presenting false information to a court thereby violating plaintiffs' constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.

67. As a direct and proximate result of the abuse of authority detailed above, plaintiffs sustained the damages stated.

## SIXTH CAUSE OF ACTION
### Malicious Prosecution under 42 U.S.C. § 1983

68. The preceding paragraphs are here incorporated by reference.

69. Defendant police officers initiated, commenced and continued a malicious prosecution against plaintiffs.

70. Defendant police officers caused plaintiffs to be prosecuted without any probable cause until the charges were dismissed on (as to plaintiff Dunleavy) September 17, 2013 and, (as to plaintiff Shulock) January 8, 2013.

71. As a direct and proximate result of the abuse of authority detailed above, plaintiffs sustained the damages stated.

## SEVENTH CAUSE OF ACTION
### Failure to Intervene under 42 U.S.C. $ 1983

72. The preceding paragraphs are here incorporated by reference.

73. Each defendant officer had an affirmative duty to intervene on behalf of plaintiffs, whose constitutional rights were being violated in their presence by the other defendant officer.

74. The defendant police officers failed to intervene to prevent the unlawful conduct described herein.

14

75.    As a direct and proximate result of the abuse of authority detailed above, plaintiffs sustained the damages stated.

## EIGHTH CAUSE OF ACTION
### Excessive Use of Force

76.    The preceding paragraphs are here incorporated by reference.

77.    On the above incident date, the individual defendant police officers' use of force upon plaintiffs was objectively unreasonable.

78.    The individual defendant officers did not have an objective and/or reasonable basis to use any degree of force against plaintiffs, since plaintiffs were unarmed, compliant, and did not resist arrest.

79.    Accordingly, the defendant police officers are liable to plaintiffs for using unreasonable and excessive force, pursuant to 42 U.S.C. § 1983; and the Fourth and Fifth Amendments to the United States Constitution.

## NINTH CAUSE OF ACTION
### *Monell* claim against defendant City of New York under 42 U.S.C. §1983

80.    The preceding paragraphs are here incorporated by reference.

81.    All of the acts and omissions by defendant police officers Nunziato, Duval and John Doe no.1 were carried out pursuant to overlapping customs, policies and/or practices of defendant CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, cooperation and under the supervisory authority of the City and its agency, the NYPD.

82.    The acts complained of were carried out by the aforementioned defendants in their capacities as police officers and officials pursuant to customs, policies, usages,

practices, procedures and rules of the CITY and the NYPD, all under the supervision of

ranking officers of the NYPD.

83.    The aforementioned  customs, practices,  procedures  and rules of the CITY and

the NYPD include, but are not limited to, the following unconstitutional practices:

- a) Arresting persons known to be innocent in order to meet "productivity goals" (i.e. arrest quotas)
- b) Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony
  - i.  in order to protect other officers; and/or
  - ii.  in order to meet said productivity goals;
- c) Failing to supervise, train, instruct and discipline · police officers  and encouraging their misconduct;
- d) Discouraging  police officers from reporting the corrupt or unlawful  acts of . other police officers;
- e) Retaliating against officers who report police misconduct; and
- f) Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

84.    The existence of aforesaid unconstitutional customs and policies may be

inferred from repeated  occurrences  of similar wrongful  conduct, as documented  in

the following civil rights actions filed against the CITY and analogous prosecutions of

police officers:

- a) *Schoolcraft v. City of New York*, 10-CV-6005 (RWS) (S.D.N.Y.) (Police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);
- b) *Long v. City of New York*, 09-CV-6099 (AKH) (S.D.N.Y.); People v. Pagan, 06·H6- 2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint is convicted of falsifying police records);

16

c) *Tayler-Mickens v. City of New York*, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct;

d) *Lin v. City of New York*, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person who was lawfully photographing the arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence[3]);

e) *Colon v. City of New York*, 09-CV-0008 (E.D.N.Y.) In an Order dated November 25, 2009, which denied the City's motion to dismiss on *Iqbal/Twombly* grounds wherein the police officers at issue were tried and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Jack Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by the arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

f) *People v. Arbeedy*, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testified that fellow narcotics officers routinely; maintained a stash of narcotics to plant on innocent civilians in order to help those' officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests stick: "*It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to*

---

[3] For a description of this case and settlement, see, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists N.Y. Times, March 30, 2010, available at*: http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/?_php=true&_type=blogs&_r=0

*them anyway. That kind of came on to me and I accepted it—being around that so long, and being an undercover.*" The presiding judge, the Honorable Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naive regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly, by the seeming casualness by which such conduct is employed.")

g) *Bryant v. City of New York, 22011/2007* (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiffs constitutional right and contributed to her arrest[4]);

h) *Williams v. City of New York*, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing: project despite evidence that he had a legitimate reason to be on the premises);

i) *MacNamara v. City of New York*, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues, to be developed in the consolidated litigation arising out of the 2004 Republican' National Convention);

j) *McMillan v. City of New York*, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers, fabricated evidence against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

k) *Avent v. City of New York*, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

l) *Smith v. City of New York*, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

m) *Powers v. City of New York*, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 2n04 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

n) *Nonnemann v. City of New York*, 02-CV-10131 (JSR) (AJP), 2004 U.S. Dist. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and

---

[4] For a description of this case and ultimate settlement, see, Oren Yaniv, Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000, N.Y. Daily News, Feb. 19, 2011, available at http://www.nydailynews.com/news/crime/court-rules-cops-quotas-woman-injured-2006-arrest-settles-75-000-article-1.134856

CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youths);

o) *Richardson v. City of New York,* 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, against an African American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

p) *Barry v. New York City Police Department*, 01-CV-10627 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

q) *Taylor v. City of New York*, 01-CV-5750(ILG)(MDG) (E.D.N.Y.) (same as *Richardson*; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

r) *White-Ruiz v. City of New York*, 93-CV-7233 (DLC)(MHO), 983 F.Supp. 365, 380 (S.D.N.Y.1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption"); and

s) *Ariza v. City of New York,* 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at 14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department);

85. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, *inter alia*, by the following:

a) The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them[5].

[…]

What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty.[6] "

b) In June of 2011, in the case in New York County Supreme Court entitled *People v. William Eiseman* (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pleaded guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another - and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here.[7]"

c) In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed,"

---

[5] See Mollen Commission Report, page 36

[6] Mollen Commission Report, pages 40-41

[7] Melissa Grace NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal, N.Y. Times June 27, 2011 , available at: http://www.nydailynews.com/news/crime/nypd-sgt-william-eiseman-pleads-guilty-lying-oath-plea-deal-article-1.129288.

when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel.  The suspect was released[8]. Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies.  Sources told The Post their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports[9].

d) In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel.  Mr. Kim was convicted for those offenses.  The 109th precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids."  The 109th precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest.  According to Assistant United States attorney Monica Ryan, members of the 109th precinct maintained a small stash of drugs in an Altoids tin for this purpose."[10]

e) In December of 2009 two officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from

---

[8] Murray Weiss *NYPD in a Liar Storm* N.Y. Post, October 26, 2009, available at:
http://nypost.com/2009/10/26/nypd-in-a-liar-storm/

[9] *Id.*

[10] John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at*: http://www.nydailynews.com/news/crime/claims-corruption-queens-precinct-put-crooked-sentencing-hold-article-1.296352

the Internal Affairs Bureau.  As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Sometime later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and (Officer Hector) Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.
>
> To complete the ruse, the undercover cop was processed at the station house so as not to tip off Stukes and Tirado about the sting.
>
> Police sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.
>
> "There's pressure on the cops from the bosses and they're getting pressured from headquarters, a police source told The Post.[11]

The officers were indicted for felony perjury, filing a false report and filing a false instrument[12].

f) In early 2010, the City settled a civil rights lawsuit wherein Police Officer Sean Spencer[13] falsely arrested and accused a 41 year old grandmother of prostitution, promising to pay the woman $35,000.  In Court documents,

---

[11] Larry Celona and Tim Perone, *Cops Sting Cops,* N.Y. Post, July 30, 2010, *available at:* http://nypost.com/2010/07/30/cops-sting-cops/

[12] John Marzulli *Brooklyn Cops Charged With Barging Into Sting Operation, Arresting a Fellow Officer on Bogus Charges*, N.Y. Daily News, July 30, 2010, *available at*: http://www.nydailynews.com/new-york/brooklyn-cops-charged-barging-sting-operation-arresting-fellow-officer-bogus-charges-article-1.204251

[13] In sum, the City has paid more than $80,000 to settle four federal lawsuits against Officer Spencer.  John Marzulli, *City Shells Out $35G To Grandmother, Monica Gonzalez, Busted As Hooker*, N.Y. Daily News, January 7, 2010, *available at*: http://www.nydailynews.com/new-york/city-shells-35g-grandmother-monica-gonzalez-busted-hooker-article-1.459661

Caroline Chen, the attorney representing the City in the case, admitted "Officer Spencer falsely reported to the Assistant District Attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that the plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense.[14]

g) Separate Grand Jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking onto drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by the New York Newsday said they believe those two grand jury investigations—in the 46th Precinct in University Heights section of the Bronx and the 34th Precinct—are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[15]

86.     Furthermore, the existence of the aforesaid unconstitutional customs and policies, **specifically with regard to "productivity goals,"** may be further inferred from the following:

a) Deputy Commissioner Paul J. Browne has repeatedly admitted that the NYPD commanders are permitted to set "productivity goals."[16]

b) An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is …summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD's Stop, Question and Frisk reports. She added, "The bottom line is everybody's individual activity is being looked at." Later in the recording—made during a roll call in 2010 at Transit District 34 in Coney Island—she said only officers with "good productivity" will get the opportunity to work overtime. She also said that Capt. James Sherrin wanted every officer to make at least one arrest per month—up from a previous order of one every three months—because crime had spiked and arrest totals were

---

[14] *Id.*

[15] David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, Others Say Department Overlooks Corruption*, New York Newsday, November 18, 1991, at 6.

[16] Jim Hoffer, *NYPD Officer Claims Pressure To Make Arrests*, WABC-TV Eyewitness News, March 2, 2010, *available at* http://7online.com/archive/7305356/

lower than the other transit districts.  "He wants everybody to get in the mindset that there's no more 'collar a quarter,'" Williams said.[17]

c) NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officers to make at least "one arrest and twenty summonses" per month.   P.O. Polanco's allegations were confirmed by an audiotape obtained by the media.  The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss, *to wit*, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and twenty is breaking your balls, guess what you'll be doing?  You're going to be doing a lot more, a lot more than what they're saying."  The tape also reveals that another patrol supervisor chimed in and told the officers: "Next week, twenty-five and one, thirty-five and one, and until you decide to quit this job and go to work at Pizza Hut, this is what you're going to be doing 'til then."[18]

d) The New York Daily News obtained and published two internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct.  The memos specifically instructed officers about "number of tickets to give drivers for cell phone, seat-belt, bus stop, tinted windows, and truck route violations they were expected to issue.  The memos remained posted for several weeks in the roll-call room until the media began inquiring.[19]

e) Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[20]

f) In December of 2010 and in response to the pressure from their supervisors to write baseless summonses pursuant to the policy and practice of "quotas," police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott."  As one officer at the

---

[17] Rocco Parascandola, *NYPD Lt. Janice Williams Captured On Tape Pushing For More Busts, But Brass Says There's No Quota*, N.Y. Daily News, March 3, 2011, *available at*: http://www.nydailynews.com/new-york/nypd-lt-janice-williams-captured-tape-pushing-busts-brass-quotas-article-1.116880

[18] *Id.*

[19] James Fanelli, *Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say*, N.Y. Daily News, Nov. 8, 2010, *available at*: http://www.nydailynews.com/new-york/cops-brooklyn-crime-ridden-77th-precinct-told-meet-quotas-moving-violations-memos-article-1.452621

[20] Tom Nanako and Kirsten Fleming, *Nighttime Riders In Big Sit Fit*, The New York Post, December 26, 2009, *available at:* http://nypost.com/2009/12/26/nighttime-riders-in-big-sit-fit/

precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[21]

g)  In response to the planned summons-boycott at the 79th Precinct, on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a Deputy Inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying, "I'll come down here and make sure you write them."  Marino also vowed to transfer people, just like he did when he was the commanding officer of the 75th Precinct in East New York.[22]

h)  Capt. Alex Perez, the second in command at the NYPD's 8151  Precinct, testified in a· civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that that arrest numbers are a factor in evaluating an officer's performance.[23]  Ultimately, the jury  in that case ruled that the police had a policy "regarding the number of arrests officers were to make, that violated plaintiffs constitutional rights and contributed to her arrest."[24]

i)  The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four parking tickets, three moving violations citations, three "quality of life" summonses, make one arrest and two stop-and-frisks each month.  Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations."  She ordered the City to cease and desist from the practice.[25]

j)  Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the North Bronx, was investigated for ordering officers to make a

---

[21] Rocco Parascandola, *Irate Cops at the 79th Precinct in Bedford Stuyvesant Threaten Boycott Over Quotas*, N.Y. Daily News, December 12, 2009, *available at*: http://www.nydailynews.com/news/crime/irate-cops-79th-precinct-bedford-stuyvesant-threaten-boycott-quotas-article-1.474648

[22] Rocco Parascandola, *Deputy Chief Michael Marino Threatens Cops at the 79th Precinct Who Want To Go On Summons Strike*, N.Y. Daily News, December 15, 2010, *available at*: http://www.nydailynews.com/new-york/deputy-chief-michael-marino-threatens-cops-79th-precinct-summons-strike-article-1.472513

[23] William J. Gorta, *Brooklyn Mom's Suit Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15, 2011 at 6, available on Westlaw at 2011 WLNR 2986205; see also Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops,* N.Y. Daily News, Feb. 15 2011, at 20, also available at Westlaw on WLNR 2986205.

[24] Oren Yaniv, *Court Rules That Cops Do Use Quotas, Woman Injured In 2006 Arrest Settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at*: http://www.nydailynews.com/news/crime/court-rules-cops-quotas-woman-injured-2006-arrest-settles-75-000-article-1.134856

[25] *New York City Ticket Quota Confirmed, Denied*, The Newspaper.com, January 21, 2006, *available at*: http://www.thenewspaper.com/news/09/914.asp; see also, Kirsten Cole, *NYPD's Bogus Little Secret: Parking Ticket Quotas—Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at*: http://passaicnews.wordpress.com/2007/08/15/nypds-bogus-little-secret-parking-ticket-quotas/

certain number of arrests each month.  According to the New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.

> "You can't make the nine dollars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.

> Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

> Creighton then told the cops to "finagle" the times of the arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.

> Unbeknownst to Creighton, one officer had his NYPD radio switched on—so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[26]

87.    The existence of the aforesaid unconstitutional customs and practices,

**specifically with regard to the failure to supervise, train, instruct and discipline**

**police officers and encouraging their misconduct**, are  further evidenced, *inter alia*,

by the following:

> a) The Report of the Commission To Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

>> In the face of this problem [of corruption] the [NYPD] allowed its systems for fighting corruption virtually to collapse.  It has become more concerned about the bad publicity that corruption disclosures generate, than the devastating consequences of corruption itself.  As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out.  Such an institutional reluctance to

---

[26] Allison Gendar, *NYPD Captain Allegedly Caught In Arrest Quota Fixing*, The New York Daily News, November 14, 2007, *available at*: http://www.nydailynews.com/news/crime/nypd-captain-allegedly-caught-arrest-quota-fixing-article-1.256006

uncover corruption is not surprising.  No institution wants its reputation tainted—especially a department that needs the public's confidence and partnership to be effective.  A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment, and potential harm to careers.   Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority— which is exactly what the Commission uncovered.   This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment.   For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[27]

b) Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c) In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in *Colon v. City of New* York, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread…custom or policy by the City approving illegal conduct" such as lying under oath and false swearing, then NYPD Commissioner Raymond Kelly acknowledged, "When it [corruption] happens it's not for personal gain.  It's more for convenience."[28]

d) Regarding the City's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a City agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[29]  When it does, however, it has been the custom and practice to vest sole control over whether the NYPD pursues the matter with the Police Commissioner, who is also the

---

[27] Mollen Commission Report, pp 2-3, *available at*: http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf

[28] Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, The New York Daily News, December 2, 2009, *available at*: http://www.nydailynews.com/news/crime/police-commissioner-kelly-shrugs-judge-slammed-cops-article-1.433710

[29] In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about six percent).  Similarly, in 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about five percent).  In 2013, out of the more than 5410 allegations that were fully investigated, the CCRB substantiated about fourteen percent.  *See* CCRB Jan.-Dec. 2007 Status Report at p 19, and CCRB 2013 Status report *available at*: http://www.nyc.gov/html/ccrb/downloads/pdf/CCRB%20Annual_2013.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above noted *de-facto* policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony and statements given to the CCRB, to cover up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

sole person with authority to impose discipline on the subject officer(s). During Police Commissioner Ray Kelly's tenure, since 2005, only one quarter of the officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions."  Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e. closed without discipline or any kind of action) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008.  Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by CCRB in 2009.[30]  As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007.  Substantiated complaints of excessive force against civilians accounted for more than 10% of cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[31]

88.    The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct** are further evidenced, *inter alia*, by the following:

a)   Former longtime New York City District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

b)   In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

c)   Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced in every way."

---

[30] Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19, *available at*: http://cityroom.blogs.nytimes.com/2009/10/05/few-results-for-reports-of-police-misconduct/?_php=true&_type=blogs&_r=0

[31] Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police,* August 20, 2008.

89.     The existence of the above-described unlawful *de-facto* policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officers and officials of the NYPD and the City, including, without limitation, Police Commissioner William Bratton, and his predecessor, Raymond Kelly.

90.     The actions of defendant officers Nunziato, Duval and John Doe no. 1 resulted from and were taken pursuant to the above mentioned *de facto* policies and/or well-settled and widespread customs and practices of defendant City, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and then Police Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves or fellow offices, supervisors and/or subordinates against those civilians.

91.     All of the foregoing acts by defendants deprived Plaintiffs of their federally protected rights, the constitutional rights enumerated above.

92.     Defendant CITY knew or should have known that the acts alleged herein would deprive Plaintiffs of their rights under the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

93.     Defendant City is directly liable and responsible for the acts of defendants Nunziato, Duval and John Doe no.1 because it repeatedly and knowingly failed to properly supervise, train instruct and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the City and the NYPD and to require compliance with the Constitution of the United States.

94.     Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the City, including then Commissioner Ray Kelly, have not taken steps to terminate these policies, practices and/or customs or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in City New York.

95.     The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers are evidenced by, *inter alia*, the police misconduct detailed herein.  Specifically, pursuant to the aforementioned City policies, practices and/or customs, defendant officers Duval and Nunziato felt empowered to arrest plaintiffs without probable cause and then fabricate and swear to a false story to cover up the blatant violations of plaintiffs' constitutional rights, and supervising officer John Doe no. 1 felt empowered to sanction and ratify and endorse

said false story.    Pursuant to the aforementioned City policies, practices and/or customs, other officers failed to intervene in or report defendant officers' violations of plaintiffs' rights.

96.    Plaintiffs' injuries were a direct and proximate result of the defendant City and the NYPD's wrongful *de facto* policies and/or widespread and well-settled customs and practices and of the knowing and repeated failure of the defendant City and the NYPD to properly supervise, train and discipline their police officers.

97.    As a result of the foregoing, plaintiffs were assaulted, unlawfully detained and deprived of their liberty, subjected to the criminal justice system, incurred legal fees, suffered great humiliation, costs and expenses, and were otherwise damaged and injured.

(*this area left blank)*

31

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs demand a jury trial and the following relief, jointly and

severally against the defendants:

a. Compensatory damages in the amount of one million dollars ($1,000,000);

b. Punitive damages in the amount of two million dollars ($2,000,000);

c. Costs, interest and reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

and,

d. Such other and further relief as this Court may deem just and proper, including

injunctive and declaratory relief.

Dated: Brooklyn, New York
        December 12, 2014

Respectfully submitted,
/S/ KENNETH F. SMITH

The Law Offices of
Kenneth F. Smith, PLLC
16 Court Street, Suite 2901
Brooklyn, NY 11241
(646) 450-9929
(646) 514-4524 (FAX)
*Counsel for Plaintiffs*